UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSHUE HOLDSWORTH,

                    Plaintiff,

          v.

UNITED STATES OF AMERICA, and
L&D JOHNSON PLUMBING & HEATING, INC.,
  a/k/a U.S. Veterans Construction & Management Corp.,

                    Defendants.
_____

                                      REPORT
                                      and
                      RECOMMENDATION

                      11-CV-00889A(F)

L&D JOHNSON PLUMBING & HEATING, INC.,
  a/k/a U.S. Veterans Construction & Management Corp.,

                    Cross-Claimant,

          v.

UNITED STATES OF AMERICA,

                    Cross-Defendant.
_____

UNITED STATES OF AMERICA,

                    Cross-Claimant,

          v.

L&D JOHNSON PLUMBING & HEATING, INC.,
  a/k/a U.S. Veterans Construction & Management Corp.,

                    Cross-Defendant.
_____

APPEARANCES:           HOGANWILLIG
                            Attorneys for Plaintiff
                            JEFFREY B. NOVAK, and
                            WENDY A. SCOTT, of Counsel
                            2410 North Forest Road
                            Suite 301
                            Getzville, New York  14068

WILLIAM J. HOCHUL, JR.
UNITED STATES ATTORNEY
Attorney for Government
GAIL Y. MITCHELL
Assistant United States Attorney, of Counsel
Federal Centre
138 Delaware Avenue
Buffalo, New York  14202

BARTH, SULLIVAN & BEHR
Attorneys for L&D Johnson Plumbing & Heating, Inc.
LAURENCE D. BEHR, of Counsel
43 Court Street
Suite 600
Buffalo, New York  14202

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J. Arcara on

November 16, 2011, for all pretrial matters including preparation of a report and

recommendation on dispositive motions.  The matter is presently before the court on

Defendant United States of America's motion to dismiss for lack of jurisdiction (Doc. No.

37), filed April 25, 2013.

## BACKGROUND

Plaintiff Joshua Holdsworth ("Holdsworth" or "Plaintiff"), commenced this action

on October 24, 2011, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§

1346(b), 2671-80, seeking to recover monetary damages for personal injuries allegedly

suffered while working on a construction project at the Veteran Affairs Hospital ("the VA

Hospital" or "the hospital"), located at 3495 Bailey Avenue, in Buffalo New York.

Defendants to this action include the United States of America ("the Government"), and

L&D Johnson Plumbing & Heating, Inc., also known as U.S. Veterans Construction &

Management Group ("L&D") (together, "Defendants").  The Government is sued as

owner of the VA Hospital, and L&D is sued as the general contractor on a project to repair and upgrade the VA Hospital's sprinkler system, on which Plaintiff's employer, Eastern Tank Services ("ETS"), was a subcontractor.  In its answer filed November 5, 2011 (Doc. No. 6), L&D asserted a cross-claim against the Government for indemnification or, alternatively, contribution should L&D be found liable for negligence or any other culpable conduct resulting in Plaintiff's injuries.

The Government initially moved on February 17, 2012 (Doc. No. 14) ("the Government's initial motion") to dismiss this action for lack of subject matter jurisdiction because Plaintiff's claims are barred by the FTCA's independent contractor exception, 28 U.S.C. § 2671(a), and the discretionary function exception, 28 U.S.C. § 2680(a). Both Plaintiff and L&D asserted the need for discovery to fully respond to the Government's initial motion (Docs. Nos. 22 (Plaintiff), and 23 (L&D)), and in a Decision and Order filed September 27, 2012 (Doc. No. 32), the undersigned granted Plaintiff and L&D a 90-day period of discovery limited to the Government's asserted independent contractor and discretionary functions exceptions to the FTCA, and dismissed the Government's initial motion without prejudice.

On October 11, 2012, the Government filed an answer (Doc. No. 33) to the Complaint, as well as to L&D's cross-claim, and also asserted cross-claims against L&D for contribution and indemnification should the Government be found to have engaged in any culpable conduct causing Plaintiff's injuries, as well as for breach of contract.  On October 12, 2012 L&D filed its answer (Doc. No. 34), to the Government's cross-claim.

In connection with the dismissal of the Government's initial motion so as to permit Plaintiff and L&D to conduct discovery limited to that necessary to oppose

dismissal of the action as against the Government for lack of jurisdiction, depositions were taken of Vincent Rizzo ("Rizzo"), and Heidi Reisman ("Reisman"), on January 16, 2013, and of Robert Reiter ("Reiter"), on February 8, 2013.  On April 25, 2013, with the limited discovery pursuant to the D&O completed, the Government filed its Renewed Motion to Dismiss Complaint (Doc. No. 37) ("Government's Motion"), along with Defendant United States of America's Memorandum of Law in Support of Its Renewed Motion to Dismiss this Action for Lack of Jurisdiction (Doc. No. 38) ("Government's Memorandum").  The Government also relies on its papers filed in support of the Government's initial motion to dismiss, *i.e.*, the Memorandum of Law in Support of Motion to Dismiss the Complaint for Lack of Jurisdiction (Doc. No. 16) ("Government's Initial Motion Memorandum"), the Declaration of Vincent Rizzo (Doc. No. 15) ("Rizzo Declaration"), with exhibits A and B (Docs. Nos. 15-1 through 15-3) ("Rizzo Exh(s). __"), the Declaration of Cherie Widger-Kresge filed May 8, 2012 (Doc. No. 26) ("Widger-Kresge Declaration"), attaching exhibits A and B (Doc. No. 26-1) ("Widger-Kresge Exh(s). __"), and the Supplemental Declaration of Vincent Rizzo filed May 8, 2012 (Doc. No. 28) ("Supplemental Rizzo Declaration"), with attached exhibit A (Doc. No. 28-1) ("Supplemental Rizzo Exh.").

In opposition to the Government's Motion, Plaintiff filed on August 28, 2013, the Declaration of Ryan Mahoney, Esq. (Doc. No. 46) ("Mahoney Declaration"), attaching exhibits A through C (Docs. Nos. 46-1 through 46-3) ("Plaintiff's Exh(s). __"), and Plaintiff Joshua Holdsworth's Memorandum of Law in Opposition to Defendant United States of America's Renewed Motion to Dismiss (Doc. No. 46-4) ("Plaintiff's Memorandum").  Filed on August 30, 2013, was Defendant L&D Johnson Plumbing &

Heating Inc.'s Memorandum of Law in Opposition to Renewed Motion of Defendant United States of America for Summary Judgment (Doc. No. 47), ("L&D's Memorandum"), the Declaration of Laurence D. Behr, Esq. (Doc. No. 48) ("Behr Declaration"), attaching exhibit A (Doc. No. 48-1) ("L&D Exh. A"), and the Declaration of Donald Johnson, Jr. (Doc. No. 48-2) ("Johnson Declaration"), and the Supplemental Declaration of Laurence D. Behr, Esq. (Doc. No. 49) ("Supplemental Behr Declaration"), attaching exhibits B-1 and B-2 (Docs. Nos. 49-1 and 49-2) ("L&D Exh(s). B-__").  L&D also incorporates by reference its papers filed in response to the Government's initial motion including Defendant L&D Johnson Plumbing & Heating Inc.'s Memorandum of Law in Opposition to Motion of Defendant United States of America to Dismiss Complaint (Doc. No. 23) ("L&D's Initial Motion Memorandum"), and the Declaration of Donald Johnson, Jr. (Doc. No. 23-1) ("Johnson Initial Motion Declaration").

On November 18, 2013, the Government filed Defendant United States of America's Reply Memorandum of Law in Further Support of Motion to Dismiss Complaint for Lack of Jurisdiction (Doc. No. 56) ("Government's Reply").  Oral argument was deemed unnecessary.

Based on the following, the Government's Motion should be GRANTED.

## FACTS[1]

The United States of America ("the Government"), through the Department of Veterans Affairs ("VA"), owns the VA Western New York Healthcare System ("VAWNYHS" or "VA Hospital"), located at 3495 Bailey Avenue in Buffalo, New York. In April 2008, following a solicitation and bid process, the Government, through the VA,

---

[1] Taken from the pleadings and motion papers filed in this action.

awarded a contract ("Contract"),[2] to L&D Johnson Plumbing & Heating, Inc. ("L&D" or

"the Contractor"), for the renovation of the sprinkler system to remediate deficiencies of

the system at the VA Hospital ("the Sprinkler Project").  The work to be completed on

the Sprinkler Project included, *inter alia*, the relining of two 25,000 gallon water storage

tanks located on the VA Hospital's top or 14th floor.[3]  The tanks, originally installed when

the VA Hospital was fabricated in the 1940s,[4] serve as a reserve capacity for the VA

Hospital's sprinkler system in the event of a fire and provide potable water should the

municipal water supply be unavailable.  Periodic relining of the tanks was necessary to

prevent corrosion to the tanks and rust in the water contained in the tanks.

The process of relining the tanks required someone to enter each tank to

sandblast the interior, thereby removing any deteriorated epoxy coating inside the tank,

exposing the bare steel metal, and recoating the inside of the tank with similar material.

The tanks had previously been relined in the 1980s ("earlier relining project"),[5] when

Eastern Tank Services ("ETS"), performed the sandblasting and relining.  L&D hired

ETS as a subcontractor to again perform the sandblasting and relining of the tanks in

connection with the Sprinkler Project.

Each tank was cylindrical in shape with a diameter, measured at the tank's end,

of 12 feet from top to bottom.  Entry into a tank for maintenance and repair was through

a manhole or manway ("manhole"), measuring approximately 24" in diameter, located

on top of the tank near one end.  In addition to the water storage tanks, ductwork for the

VA Hospital's ventilation system was located on the 14th floor, having been originally

---

[2] A copy of the Contract is filed as Exh. A to the Rizzo Declaration.
[3] Although the Sprinkler Project actually called for the renovation of two 25,000 gallon water storage tanks, Plaintiff's personal injuries were sustained in connection with only one of the tanks.
[4] Reiter estimated the VA Hospital was constructed "around 1949."   Reiter Dep. Tr. at 8.
[5] The exact date of the earlier relining project is not in the record.

installed in the 1940s when the tanks were installed.  A portion of the ductwork was situated directly over the manhole providing entry to one of the tanks ("the subject tank"), leaving only 15 inches of clearing between the ductwork and the subject tank's manhole.  No similar ductwork was located over the manhole to the second tank.  Inside the subject tank, descent into the tank was by a ladder, welded in place at a 45 degree angle from the manhole to the tank's floor.

The contracting officer when the Sprinkler Project was put out to bid was Scott Fiscus ("Fiscus"), who left before the Sprinkler Project's completion, when Jonathan Aikin ("Aikin"), became the contracting officer.  Vincent Rizzo ("Rizzo"), the Engineering Manager for the VA at the VAWNYHS and responsible for the day to day operations of the engineering and environmental management departments at the VAWNYHA, was involved in the Contract for the Sprinkler Project, which was part considered to be ongoing maintenance of the VA Hospital building infrastructure.  Robert Reiter ("Reiter"), a VA engineering technician and project manager, was the Contracting Officer's Technical Representative ("COTR") for the Sprinkler Project, and Heidi Reisman ("Reisman") was the VA's industrial hygienist and safety manager.

The Sprinkler Project Contract required L&D, the Contractor, to

[p]rovide all labor, materials, equipment, and supervision to CORRECT SPRINKLER DEFICIENCIES at the VA Western New York Healthcare System, Buffalo, New York. All work shall be performed in accordance with the attached contract documents, and all applicable local, state, and federal codes.

Contract at 1.

Under the Contract, L&D was responsible for establishing plans and procedures to complete the Sprinkler Project as contemplated in the Contract, including all decisions regarding the choice of materials and construction methods to be used, the possible use

7

of hazardous materials, and the safety of the worksite ("worksite").  The Operations and

Storage Areas section of the Contract provided "[t]he Contractor shall hold and save the

Government, its officers and agents, free and harmless from liability of any nature

occasioned by the Contractor's performance."  Contract § 1.11.A.  Further, "[w]hen a

building/project is turned over to Contractor, Contractor shall accept entire responsibility

therefore."  *Id.* § 1.11.I.  The Contract's solicitation for bids, contained in a section titled

Instructions, Conditions and Other Statements to Bidders/Offerors, Contract at 36-38,

as relevant here, requires that

> [t]he Offeror shall demonstrate knowledge of and experience and compliance
> with OSHA, NFPA and VA requirements for safety during construction.  The
> Offeror shall describe methods to be used to ensure that an OSHA certified
> Competent Person will maintain a presence at the work site whenever work is
> being done. (See General Requirements 01010, 1.1.F).  The Offeror shall
> describe the methods to be used to ensure all workers shall have received the
> required minimum 10-hour OSHA training (See General Requirements 01010,
> 1.1.G).
> The Offeror shall describe the qualifications/experience, duties, and authority of
> the QC/Safety Manager who will be assigned to monitor the Offeror's personnel
> (including subcontractors) for safety and quality job performance.

*Id.* at 37.

The Contract also incorporated by reference numerous provisions of the Federal

Acquisition Regulations, 48 C.F.R., Chapter 1, Part 52 ("FAR"), including, as relevant to

this action, FAR §§ 52.236-6, Superintendence by the Contractor (Apr. 1984), 52.236-7,

Permits and Responsibilities (Nov. 1991), and 52-236.20, Operations and Storage

Areas (Apr. 1984).  Contract § 4.27 at 70-72.  L&D was responsible for quality control,

risk assessment, safety, and Occupational Safety and Health Administration ("OSHA")

compliance.  Contract at 37, Subfactors C.2 (Quality Control and Risk Assessment),

and C.3 (Safety and Infection Control).  L&D was also responsible for inspecting the

worksite for conditions affecting the work to be performed under the Contract.  Contract § 2.7 at 41 (incorporating by reference 48 C.F.R. §§ 52.236-27, 52.236-2, and 52.236-3).  In particular, 48 C.F.R. § 52.236-27 required any contract awarded include 48 C.F.R. §§ 52.236-2 and 52.236-3 such that offerors for the Contract "are urged and expected to inspect the site where the work will be performed."  Pursuant to 48 C.F.R. § 52.236-2, Differing Site Conditions, the Contractor is required to "promptly" provide "written notice to the Contracting Officer"[6] of "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." 48 C.F.R. § 52.236-2(a).  Upon receiving such notice, the Contracting Officer is required to investigate the site conditions and, if the conditions do materially differ, increase or decrease the cost and time allotted for the Sprinkler Project as a result of the difference, with an equitable adjustment of the Contract made in writing.  48 C.F.R. § 52.236-2(b). Absent the requisite written notice of a material difference in the worksite conditions, however, no equitable adjustment to the Contract was allowed.  48 C.F.R. § 52.236-2(c).  Further, 48 C.F.R. § 52.236-3, Site Investigation and Conditions Affecting the Work, provides that

> [t]he Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to . . . the character of equipment and facilities needed preliminary to and during work performance.  The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of . . . obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site . . . .  Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of

---

[6] The "Contracting Officer" is defined as "a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings."  48 C.F.R. § 2.101, Definitions.

successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

48 C.F.R. § 52.236-3(a).

Moreover,

> [t]he Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government.  Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

48 C.F.R. § 52.236-3(b).

The Contractor was required to obtain at its own expense insurance which was to be in effect during the entire performance of the Sprinkler Project.  Contract § 4.7.

The Contract also delegated responsibility to the Contractor, L&D, for safety and compliance with all applicable laws and codes.  Contract § 4.27.  Nevertheless, the VA retained inspection authority over the Sprinkler Project.  Contract §§ 4.15, Government Supervision (providing "work will be under the direction of the VA contracting officer, who may designate another VA employee to act as resident engineer at the construction site."); and 4.12 (inspection of the worksite to be made "by the resident engineer").

While the Sprinkler Project was underway, Reiter, the COTR, had weekly construction progress meetings with Donald Johnson ("Johnson"), a Principal of L&D while the Sprinkler Project was ongoing, safety officer Reisman, Elaine Watson from infection control, and VA plumbing department supervisor Mark Parsons ("Parsons").  During the course of the Sprinkler Project, Reiter made daily inspections of the 14th floor.  On one occasion, Reisman halted work on the Sprinkler Project to address a

safety concern regarding the best communications method between workers inside and outside the tanks, and how a worker who fell ill or became injured inside one of the tanks could be retrieved.  The stoppage lasted less than a day and was resolved with the development of a communication code consisting of pounding on the tank, and the addition of a device called a "come-along" consisting of a tripod and crank with a cable over the manhole to assist in retrieving anyone who may become injured or ill while working inside a tank.  The come-along device was installed by the subcontractor ETS.

On October 30, 2008, Plaintiff Joshua Holdsworth ("Plaintiff" or "Holdsworth"), while working for his employer, ETS, injured his back when, while attempting to exit the subject tank located directly beneath the ductwork, he became stuck in the subject tank's manhole.[7]  The relining of the subject tank in the earlier relining project in the 1980s was completed by ETS without any incident involving an injury attributable to the manhole, despite the fact that the same manhole in which Plaintiff became stuck on October 30, 2008, located beneath the ductwork with only 15 inches of clearance, was also used to access the subject tank in connection with the earlier relining project.

According to Reiter, it was only in connection with the relining the second tank, after the incident in which Plaintiff allegedly sustained his injuries while exiting the subject tank, that Keith Holdsworth, Plaintiff's brother and owner of ETS, advocated adding a second manhole in the second tank, on the tank's end cap, rather than on top of the tank, asserting another access point was required by OSHA.  Reiter Dep. Tr. at 45-46.  Upon checking OSHA requirements, however, Reisman determined a second access point was not necessary and the request was denied.  Reiter Dep. Tr. at 45.

---

[7] The record does not indicate the extent of Plaintiff's injuries, nor reveal how Plaintiff was injured while exiting the subject tank.

After the incident in which Plaintiff allegedly sustained his injuries, the relining of the subject tank was completed without the addition of another manhole or access point, but the second tank was not relined at that time because the condition of the tanks' interiors was quite pitted and required more restoration work at a greater cost than originally contemplated such that after relining the subject tank, there was not enough money left to reline the second tank.  The decision was made to finish relining the subject tank, but not to move forward with relining the second tank.  The second tank was relined about two years later without the addition of another access point on the second tank.

## DISCUSSION

The Government's Motion to dismiss the Complaint as against it for lack of subject matter jurisdiction is pursuant to Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)").  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed.R.Civ.P. 12(b)(1)).  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the compliant (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  *Tandon v. Captain Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citing *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  Where, however, "'jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits.'"  *Id.* (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).  "[T]he party

asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Id.* (quoting *Makarova*, 201 F.3d at 113).

Plaintiff's claims against the Government are pursuant to the Federal Tort Claims Act pursuant to which the Government waives its sovereign immunity to suit unless an exception applies. "'Under settled principles of sovereign immunity, the United States, as sovereign, is immune from suit, save as it consents to be sued. . . .'" *Exxon Mobil Corp. & Affiliated Cos. v. Commissioner of Internal Revenue*, 689 F.3d 191, 201 (2d Cir. 2012) (quoting *United States v. Dalm*, 494 U.S. 596, 608 (1990)). "Absent the Government's consent to being sued, the court is without jurisdiction over a claim against the Government. *Gardner v. United States*, 446 F.2d 1195, 1197 (2d Cir. 1971) ("A federal court has no jurisdiction of a suit against the federal government unless its consent to be sued is affirmatively established by statute."), *cert. denied*, 405 U.S. 1018 (1972).

"In 1946, Congress adopted the FTCA which, subject to numerous exceptions, waives the sovereign immunity of the federal government for claims based on the negligence of its employees." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (citing 28 U.S.C. §§ 1346(b), 2671 *et seq.*). As relevant here, the FTCA authorizes suit against the Government to recover damages for

> personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

"'A wavier of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text' and 'will be strictly construed, in terms of its scope, in favor of the sovereign.'"  *Exxon Mobil Corp.*, 689 F.3d at 201 (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).  Under the FTCA, the federal courts are bound to apply the law of the state where the accident occurred.[8]  *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000) (citing *Richards v. United States*, 369 U.S. 1, 10-15 (1962)).  Further, there are several exceptions to the limitations on the FTCA's waiver of sovereign immunity including, relevant here, the  independent contractor exception ("ICE"), 28 U.S.C. § 2671 ("§ 2671"), and the discretionary function exception ("DFE"), 28 U.S.C. § 2680(a) ("§ 2680").

The Government seeks the dismissal of all claims against it pursuant to the ICE, Government's Memorandum at 13-18, as well as the DFE.  *Id.* at 18-24.  Both Plaintiff and Defendant L&D oppose the motion arguing neither exception to the FTCA applies. In particular, Plaintiff argues the ICE does not apply because the Complaint asserts negligence allegations against Government employees, including creating a hazardous condition by defective design of the water tank, and failing to either add a second manhole for access to the subject tank or to alter the configuration of the ductwork located over the subject tank's sole manhole.  Plaintiff's Memorandum at 3-6, 11-13. Both Plaintiff and L&D maintain the ICE does not apply because the Government retained control over the work to be performed under the Contract.  Plaintiff's Memorandum at 6-10 (citing caselaw); L&D's Memorandum at 2-9 (same).  Both

---

[8] Although the court is bound to apply New York law, New York's law establishing strict landlord liability is not applicable. *See Roditis v. United States*, 122 F.3d 108, 111-12 (2d Cir. 1997) (holding that despite New York law providing landowner has nondelegable duty to ensure premises are safe, Congress, by adopting ICE to FTCA liability, did not simlutaneously adopt exceptions to ICE, and FTCA precludes liability without fault).

Plaintiff and L&D also argue the DFE does not preclude jurisdiction over Plaintiff's claims because the Government's design of the subject tank was not discretionary and the Government had a duty to use due care in installing the subject tank and ductwork. Plaintiff's Memorandum at 11-13; L&D's Memorandum at 9-15.

In further support of dismissal, the Government maintains Plaintiff's assertions the ICE does not apply because the Government was directly negligent in defectively designing and installing the subject tank and ductwork, such allegations actually establish the design and installation decisions made by the Government are within the DFE.  Government's Reply at 6.  The Government argues Plaintiff's assertion that the Government maintained control and authority over the Sprinkler Project work under the Contract, thus barring the ICE, is not supported either by the factual record before the court or the Contract language.  *Id.* at 6-7.   The Government further maintains that it retained no control over the daily supervision of the Sprinkler Project work at the worksite, and that the Contract contains numerous provisions requiring L&D to supervise the work, with the Government only retaining the right to inspect L&D's progress which is insufficient to cast the Government in liability for the work performed by L&D.  *Id.* at 7-12.  With regard to the DFE, the Government argues both Plaintiff and L&D have failed to rebut the Government's showing that its decisions regarding the design of the subject tank and the ductwork surrounding the tank, as well as whether to modify such designs, were discretionary in nature by presenting material providing a basis supporting an argument that a plausible case exists for non-discretionary or non-policy action.  *Id.* at 12-16.

1.      **Independent Contractor Exception**

The Government asserts it is shielded from liability for Plaintiff's injuries by the independent contractor exception to the FTCA because the Contract establishes the Government was not responsible for the day-to-day supervision of the Sprinkler Project, but merely retained the right to inspect and oversee the Sprinkler Project, which is insufficient to avoid the ICE's jurisdictional bar.  Government's Memorandum at 14-18. In opposition, Plaintiff asserts the ICE does not apply because the Government created the hazardous condition in question, Plaintiff's Memorandum at 4-6, the Government retained control over the Sprinkler Project such that L&D did not have autonomy and freedom with regard to the Sprinkler Project, *id.* at 6-9, and the Government was extensively involved in the day-to-day Sprinkler Project operations.  *Id.* at 9-11.  L&D similarly argues against the ICE's application maintaining the Government retained supervision and control over the Sprinkler Project, L&D's Memorandum at 3-6, and L&D had no contractual duty to add a second manhole to the subject tank to provide easier access.  *Id.* at 6-9.  In further support of dismissal, the Government argues inasmuch as Plaintiff asserts the ICE does not apply to allegations of "direct negligence" by Government employees, any such acts of "direct negligence" are within the purview of the ICE, Government's Reply at 6, and neither Plaintiff nor L&D have pointed to facts establishing the Government retained the requisite control over the Sprinkler Project to negate the ICE.  Id. at 6-12.

Despite the FTCA's exception to the rule that the United States is typically immune from suit, "sovereign immunity precludes suits against the United States for injuries caused by its independent contractors."  *Roditis*, 122 F.3d at 111.  Under the

FTCA, as relevant, "government employees" are defined as "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity. . . . "  28 U.S.C. § 2671 ("§ 2671").  Significantly, "federal agency" includes "executive departments . . . but does not include any contractor with the United States." *Id*.  Plaintiff and L&D do not dispute the VA is an executive department for purposes of § 2671.  "Under the FTCA's independent contractor exception, 'where the United States is *wholly without fault*, the federal government may not be held liable for a negligent or wrongful act or omission of an independent contractor even where state law would impose liability.'"  *Haskin v. United States*, __ Fed.Appx. __, 2014 WL 2597581, at * 2 (2d Cir. June 11, 2014) (quoting *Roditis*, 122 F.3d at 111 (holding FTCA does not extend to liability without fault, such that where government is wholly without fault, it is not liable for an independent contractor's negligent or wrongful act or omission, even under circumstances where state law would impose liability)).  As noted, the Government is not subject to New York law establishing landlord liability.  Discussion, *supra*, at 14 n. 8.  Accordingly, the court must determine "(1) whether the tortfeasors were acting in the role of employee of the Government or independent contractor, within the meaning of the FTCA, and (2) if they were employees, whether they were acting within the scope of their employment."  *B&A Marine Co., Inc. v. American Foreign Shipping Co., Inc.*, 23 F.3d 709, 713 (2d Cir. 1994)

Whether an entity is a government employee or an independent contractor is a question of federal law, not fact.  *Leone v. United States*, 910 F.2d 46, 49 (2d Cir. 1990) (citing *Logue v. United States*, 412 U.S. 521, 528 (1973)), *cert. denied*, 499 U.S. 905 (1991).  *See B&A Marine Co., Inc.*, 23 F.3d at 713 ("For purposes of the FTCA, the

common law of torts and agency defines the distinction between an independent

contractor (for whose torts the Government is not responsible) and an employee,

servant or agent (for whose torts the Government is responsible).").  Thus, the court

may, on the Government's Motion, consider the record relevant to this question.

Discussion, *supra*, at 12.  "A critical element in distinguishing an agency from a

contractor is the power of the Federal Government 'to control the detailed physical

performance of the contractor.'"  *United States v. Orleans*, 425 U.S. 807, 814 (1976)

(quoting *Logue*, 412 U.S. at 528).  In evaluating the nature of the relationship between

L&D and the Government, the court focuses on the terms of the contract between them.

*Moreno v. United States*, 965 F.Supp. 521, 534 (S.D.N.Y. 1997) (citing *Williams v.*

*United States*, 50 F.3d 299, 305 (4th Cir. 1995)).  Two factors that are indicative of an

agency relationship include whether (1) "the Government enjoys the 'power to <u>control</u>

<u>the</u> <u>detailed</u> <u>physical</u> <u>performance</u> of the contractor," or (2) "the Government in fact

<u>supervises</u> the 'day-to-day operations.'"  *B&A Marine Co., Inc.*, 23 F.3d at 713

(underlining added and quoting *Orleans*, 425 U.S. at 814-15 (citing *Logue*, 412 U.S. at

528)).  In the instant case, the record indisputedly supports that neither of these two

factors is indicative of an agency relationship between the Government and L&D

sufficient to negate the applicability of the ICE.

In particular, merely retaining general oversight or the right to inspect a

contractor's work does not convert the contractor into a federal employee.  *Roditis*, 122

F.3d at 111.  Further, contract provisions reserving to the Government (1) "general

oversight over the project to ensure strict compliance with the terms of the contract," (2)

"the right to inspect for noncompliance" and to advise the contractor of the same if

discovered, and (3) "the option of halting work" if the contractor refused to rectify any

discovered noncompliance, weigh against finding the Government retained "day-to-day

management of the worksite or controlled [L&D's] physical performance of the work."

*Cerrone v. United States*, 2006 WL 2795614 at * 4 (W.D.N.Y. Sept. 26, 2006).  Nor

does "'[t]he fact that the contract required compliance with federal standards and

contract specifications'" constitute day-to-day control by the Government.  *Id.* (quoting

*Corey v. United States*, 1996 WL 406842 at *2 (N.D.N.Y. July 11, 1996)).  Broad

supervisory power, including the right to inspect for compliance with the contract and

applicable rules and regulations, as well as conducting such inspections to ensure such

compliance are all insufficient to establish an entity is a government employee.  *Id.*

(citing cases).   Applying these considerations in the instant case establishes L&D was

not acting as the Government's employee in connection with the circumstances under

which Plaintiff was injured because the Government did not retain authority over the

daily supervision of the Sprinkler Project, but only authority to inspect for compliance

with the Contract as well as with applicable regulations and statutes.

Specifically, that L&D was responsible for the day-to-day supervision of the

Sprinkler Project is a demonstrated by the Contract as well as by the deposition

testimony of VA employees Reiter, Rizzo, and Reisman.  The Contract unambiguously

delegates to L&D both physical control of the worksite, as well as daily supervision over

the Sprinkler Project.  *See* Contract §§ 1.11.I. ("When a building/project is turned over to

Contractor, Contractor shall accept entire responsibility therefore."); 2.7 (incorporating

by reference 48 C.F.R. §§ 52.236-27 (requiring any awarded contract include 48 C.F.R.

§§ 52.236-2 and 52.236-3 such that contractors are "urged and expected to inspect the

site where the work will be performed"); 52.236-2 (requiring Contractor to provide prompt, written notice of "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract," and the COTR, upon receiving such notice, to investigate the site conditions and, if site conditions do materially differ, increase or decrease the allotted cost and time for the project; absent a written request, no equitable adjustment to the Contract is allowed); and 52.236-3 (providing Contractor acknowledges "it has satisfied itself as to the . . . obstacles to be encountered insofar as this information is readily ascertainable from an inspection of the site . . .," the Contractor's failure to do so does not relieve the Contractor of any additional work or cost necessary to successfully perform the job without additional expense to the Government, and the Government does not assume "any responsibility for any understanding reached or representation made concerning conditions which can affect the work . . . before the execution of this contract, unless that understanding or representation is expressly stated in this contract." )).  L&D was also responsible for supervising any subcontractors.  Contract at 37, Subfactor C.2 Quality Control & Risk Assessment (requiring Contractor "demonstrate techniques for work coordination with Subcontractors," and "[d]escribe what is in place to monitor performance of Subcontractors and guarantee performance."); Subfactor C.3 Safety and Infection Control (requiring Contractor "describe the qualifications/experience, duties, and authority of the QC/Safety Manager who will be assigned to monitor the [Contractor's] personnel (including subcontractors) for safety and quality job performance.").  L&D was also required to obtain and maintain insurance for the Sprinkler Project.  Contract § 4.7.

In contrast, the Government retained only inspection authority to ensure compliance with the Contract as well as all applicable codes, regulations, and statutes.  *See* Contract §§ 4.15 (providing "work will be under the direction of the VA contracting officer, who may designate another VA employee to act as resident engineer at the construction site."); and 4.12 (worksite inspection to be made "by the resident engineer").  As such, the Contract alone establishes L&D, and not the Government, was responsible for the day-to-day management of the Sprinkler Project.  *See Cerrone*, 2006 WI 2795614 at * 3-4 (contract provision requiring contractor "to procure and maintain proper insurance, to directly superintend worksite at all times, to comply with applicable laws, regulations, and codes, and to be generally responsible for worksite safety and accident prevention," in addition to delegating to contractor "the obligation to provide and maintain work environments and procedures which will . . . safeguard the public and Government personnel" weighed against finding "the Government retained day-to-day management of the worksite or controlled [the contractor's] physical performance of the work.").

The Contract thus places responsibility on L&D for both the day-to-day supervision of the Sprinkler Project, as well as any changes to be made to the Contract, with the Government retaining authority only to inspect the Sprinkler Project's progress for conformity with the Contract and applicable statutes and regulations.  The deposition testimony given by the three VA employees whose depositions were taken with the court's permission as necessary to prepare papers opposing the Government's motion to dismiss for lack of jurisdiction, *i.e.*, Rizzo, the VAWNYHS engineering manager, Reiter, the COTR for the Sprinkler Project, and Reisman, the VA's industrial hygienist

and safety manager,[9] is consistent with the Contract's provision placing responsibility for day-to-day supervision of the Sprinkler Project, as well as any requests to amend the Contract, on the Contractor L&D, with the Government retaining only inspection authority.

In particular as Rizzo explained at his deposition, Rizzo Dep. Tr.[10] at 47-49, the Contract specifies that it is a contract bidder's responsibility to review the site and determine what is necessary to execute the Sprinkler Project so that, if more than one contractor bids on a job, all bids presumably would include all costs necessary to perform the job such that if one contract bidder perceived the need for ancillary work, such as, as Plaintiff contends, the installation of an additional manhole on the subject tank, or moving or rerouting ductwork, the cost for such work would be included in that contractor's submitted bid. *Id.* at 48-49. Otherwise, one contractor bidder could decline to include the expense of such ancillary work in its bid so as to be the lowest bidder, and then, after being awarded the contract as the lowest bidder, demand changes to the contact to accommodate the additional work that another contract bidder may have included in its higher bid. *Id.* at 49. The means and methods of completing the Sprinkler Project were the contractor's responsibility; if the contractor believed entering the subject tank through the existing manhole was hazardous, the contractor would have been permitted to install another manhole on a more accessible area of the subject tank, or to cut off the end of the subject tank and weld it back on after the Sprinkler Project was completed, or to reroute the ductwork located above the manhole. *Id.* at 51, 53-54. The contractor, however, would have been responsible for the costs of

---

[9] Neither contracting officer for the Sprinkler Project, Fiscus nor Aikin, was deposed.
[10] References to "Rizzo Dep. Tr. at __" are to the pages of the transcript of Rizzo's deposition, a copy of which is filed as Plaintiff's Exh. B.

any such modification.  *Id.*  The Government would refrain from interfering with the contractor's chosen means and methods so as to avoid limiting bid competition among the contractors because one contractor may choose means and methods that were more economical than another.  *Id.* at 54.

Although nothing prevented L&D from requesting a change to the Contract to accommodate additional work such as adding a second or alternative access point to the subject tank, or the Government from issuing a change order for a specific job upon agreeing such change was necessary, it is undisputed that L&D never submitted a request for a change order to add another manhole to the subject tank.  Rizzo Dep. Tr. at 49.  Nor was any additional access point to either tank requested when the tanks were relined in the 1980s during the earlier relining project.  *Id.* at 51-52.  Rizzo defined "change order" as "an actual modification to the contract to add or delete work in some cases."  *Id.* at 68.  If a request to perform extra work were accepted by the Government, it would become a change order, which is generally accompanied by additional compensation to the contractor for the additional work.  *Id.* at 68-69.  The contracting officer is the only one from the Government with authority to stop a project for quality control or quality assurance issues.  *Id.* at 86.  Otherwise, the safety officer was authorized to halt a project being performed under unsafe working conditions.  *Id.*

Reiter, the Sprinkler Project's CORT, described the ductwork on the 14th floor as being installed in the hospital upon its completing in 1949, "very large," about 12 feet wide, and four feet high.  Reiter Dep. Tr.[11] at 26  The ductwork draws air from outside down to the airhandling units on the 12th and 13th floors, where most of the hospital's

---

[11] References to "Reiter Dep. Tr. at __" are to the page of the transcript of Reiter's deposition, a copy of which is filed as Plaintiff's Exh. A.

ductwork is located.  *Id.* at 7.  According to Reiter, he had never participated in any discussion regarding modifying the ductwork, *id.* at 9, and stated relocating the ductwork was not practical because there was nowhere else to place it, and even raising the ductwork was not an option because it was already "pretty snug to the ceiling."  *Id.* at 20, 26.  Although Reiter was present at weekly construction meetings ("construction progress meetings") attended by, among others, Don Johnson of L&D ("Johnson"), and the VA's safety manager Reisman, the meetings typically lasted less than an hour during which was discussed the construction progress over the previous week and the construction planned for the upcoming week.  *Id.* at 12-13.  Reiter described L&D's role in the Sprinkler Project as "they owned the contract, they were to supervise and be responsible for all their subcontractors, as well as to provide on site supervision daily," whereas Reiter's daily trips to the 14th floor were "[j]ust to inspect what was going on.  I would get an update from Don [Johnson] usually."  *Id.* at 14. Reiter was never involved in any discussions regarding the proximity of the ductwork to the manhole in the subject tank or relocating the tanks.  *Id.* at 17-18.  During the course of the Sprinkler Project, Reiter spoke with Keith Holdsworth, Plaintiff's brother and owner of ETS, during a few of the weekly construction progress meetings.  *Id.* at 19. According to Reiter, it was Johnson, of L&D,who often supervised the work performed by ETS.  *Id.* at 39.  Reiter could not recall any conversation during a weekly construction progress meeting regarding the 15" clearance between the subject tank's manhole and the ductwork located directly above, nor did Reiter ever attempt to enter the subject tank through the manhole, explaining that although he understood the manhole entry was "a tight space," Reiter understood that "tank contractors are used to tight spaces, they go

into a lot of tight tanks and a lot of small openings," including smaller tanks frequently installed in schools. *Id.* at 40-42. Reiter verified that upon reviewing the original design and blueprints for the tanks and ductwork, "[e]verything was original equipment, all installed in 1949." *Id.* at 43. Reiter also confirmed that it was only after the work on the subject tank was completed that Holdsworth advocated installing a second manhole in the second tank, to be located on the tank's end-cap, such that the second tank would have to be drained prior to opening the second manhole to avoid spilling the water inside the tank onto the floor. *Id.* at 45-46.

According to Reiter, VA procedures require contractors to immediately report any accidents or injuries to Reiter. Reiter Dep. Tr. at 47.Although Johnson had immediately reported two other unrelated accidents to Reiter and Rizzo, Johnson did not report Plaintiff's accident and injury and Reiter was not advised of Plaintiff's injuries until this action was commenced, at which time Reiter immediately inspected the site of the accident despite the passage of time. *Id.* at 21-23. Reiter also reviewed his file for the Sprinkler Project and observed several change order requests regarding the tanks, but the requested changes pertained to additional welding and patching of the interior of the tanks necessitated by greater pitting than was anticipated, and no change order pertained to access to the subject tank. *Id.* at 23. Reiter explained that the extensive pitting required putting off the relining of the second tank, the cost for which was taken as a credit to the Sprinkler Project and ultimately put toward the relining of the second tank at a future date, but Reiter did not attribute the delay in relining the second tank to Plaintiff's injury or a request to install an alternative access point to the second tank. *Id.* at 23-33.

Reisman explained that as the VA's industrial hygienist and safety manager, she was responsible for, as relevant here, OSHA compliance.  Reisman Dep. Tr.[12] at 6-7. According to Reisman, prior to the commencement of a construction project, she would meet with the contractor to discuss the contractor's health and safety plan and to identify any part of the project that raised safety concerns or presented potential hazards.  *Id.* at 11.   Reisman would review the contractor's plans for handling such concerns and hazards to ensure minimal impact on the facility and patients.  *Id.* Reisman explained that with regard to the Sprinkler Project, the tanks were "confined spaces" requiring compliance with certain OSHA regulations, but that because the tank did not present an actual or potential atmospheric hazard, the tank did not require a second access point.  *Id.* at 13-15.  The tanks were, however, considered "permit required confined spaces" as they presented other hazards, including the cylindrical configuration of the floor, the presence of moisture on the floor, the requirement of a ladder to reach the floor from the manhole, the absence of light inside the tanks, and possible temperature fluctuations.  *Id.* at 41-43.  Nevertheless, the VA was only required to advise the contractor of the permit required confined space, and the contractor was obligated to ensure the safety of any workers in the confined space.  *Id.* at 44-45.

It was Reisman's recollection, consistent with Reiter's, that there was no discussion regarding adding a second access point to the tanks until the renovation of the subject tank was completed.  *Id.* at 23-24, 51-52.  According to Reisman, work on the Sprinkler Project was briefly halted only once, in November 2008, to address a concern regarding how to arrange for communications between a worker inside a tank

---

[12] References to "Reisman Dep. Tr. at __" are to the page of the transcript of Reisman's deposition, a copy of which is filed as Plaintiff's Exh. C.

and those outside the tank and to arrange for an alternative system for retrieving an injured worker from a tank.  *Id.* at 25-29.  Reisman reiterated the work stoppage was concerned only with maintaining communication with a worker inside the tank, as well as the retrieval of an injured worker from the tank, and did not concern facilitating entry or egress by a non-incapacitated worker.  *Id.* at 55-56.

Reisman explained she participated in a weekly review of the Sprinkler Project progress.  Reisman Dep. Tr. at 32-33.  According to Reisman, her job required her to evaluate and ensure the safety of the people and patients inside the VA Hospital while the Sprinkler Project was underway, whereas the Contractor was responsible for ensuring compliance with OSHA regulations as well as with any other applicable statutes and regulations.  *Id.* at 33-34.  Although Reisman described the entry into the subject tanks as "difficult," she understood that access to confined spaces generally is difficult.  *Id.* at 47-48.  Reisman further understood the proximity of the ductwork to the manhole on the subject tank presented a challenge to anyone attempting to enter or exit the tank, even if not incapacitated, but stated that "it is the responsibility of the contractor to identify how their worker can safely enter and exit that tank."  *Id.* at 49-50.

The evidence is also consistent with Johnson's averment in support of the Government's initial motion, Johnson Initial Declaration (Doc. No. 23-1) ¶ 8, that "one or more representatives of the VA Safety Department . . .visited the water tank renovation site several times and attended several of the job meetings, at which VA safety requirements and OSHA rules and regulations were discussed on several occasions." Johnson specifically placed at the meetings VA Safety Department employee Reisman, and VA Plumbing Department Supervisor Parsons "who acted as the VA's inspector for

27

this contract." *Id.* As such, Johnson's averments support the Government's assertion that it did not supervise the daily progress of the Sprinkler Project, but merely inspected the Sprinkler Project to ensure compliance with the Contract and all applicable codes, regulations, and statutes.

The evidence in the instant record thus establishes that pursuant to the Contract, L&D was an independent contractor with regard to the Sprinkler Project because L&D assumed all responsibility for the day-to-day supervision of the Sprinkler Project, with the Government retaining only authority to inspect for compliance with the Contract and all applicable statues and regulations, that if a second manhole or access point to the subject tank was required to renovate the subject tank, it was L&D's responsibility to submit a change order request, which was not done, and Reisman's job responsibilities as the VA's safety manager were to ensure the safety and well-being of the VA staff and patients, rather than of the construction workers for the Sprinkler Project.  On this record, the ICE to the FTCA deprives this court of jurisdiction over Plaintiff's claim, requiring dismissal of the action as against the Government.  Although the court is recommending dismissal of all claims as against the Government because jurisdiction under the FTCA is barred by the ICE, because the matter is before the undersigned for a report and recommendation, the alternative argument that the DFE precludes jurisdiction under the FTCA is addressed in the interest of completeness.

## 2.    Discretionary Function Exception

The Government argues in support of dismissal that the discretionary function exception to the FTCA bars Plaintiff's negligence claim insofar as it is based on the

Government's employment of an independent contractor who failed to properly supervise the Sprinkler Project, Government's Memorandum at 20-23, negligent design, *id.* at 23-24, and failure to warn. *Id.* at 24. In opposition to the Government's Motion, Plaintiff argues the Government's acts in connection with the Sprinkler Project were not of a sufficiently discretionary nature for the DFE to apply, Plaintiff's Memorandum at 11-13; whereas L&D maintains the Government did not delegate complete authority over the Sprinkler Project to L&D, but retained supervisory authority, L&D's Memorandum at 9-10, and distinguishes the caselaw on which the Government relies in support of the DFE from the circumstances under which Plaintiff sustained his injuries. *Id.* at 11-14. In further support of its assertion that the DFE shields the Government from liability in this action, the Government argues Plaintiff has not met his burden of demonstrating there is a plausible basis supporting a finding that the Government's challenged actions were non-discretionary or non-policy action. Government's Reply at 12-16. With regard to L&D, the Government maintains L&D conflates two separate issues in arguing the Government's defective design of the tank and ductwork precluded the Government from delegating to L&D responsibility for safety in connection with the Sprinkler Project, *id.* at 16, and that L&D, like Plaintiff, has failed to meet its burden of alleging facts establishing the DFE's inapplicabilty. *Id.*

As relevant to this case, under the DFE, the FTCA does not apply to "claim[s] based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of the DFE is based on considerations of separation of powers, *i.e.*, executive vs. judicial, to "prevent judicial second guessing of legislative and

administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (internal citations and quotation marks omitted).  "The DFE is not about fairness, it is about power; the sovereign reserves to itself the right to act without liability for misjudgment and carelessness in the formulation of policy." *Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013) (internal quotation marks and citation omitted). "The DFE bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an element of [executive] judgment or choice and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." *Id.* (quoting *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (internal quotation marks and citations omitted).  The initial burden is on Plaintiff to state a claim that is not barred by the DFE.  *Id.* (citing *United States v. Gaubert* v. 499 U.S. 315, 324-25 (1991) ("For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.").

Further, "[a] discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions." *Gaubert*, 499 U.S. at 325.  Nor is discretionary conduct "confined to the policy or planning level." *Id.*  Instead, "'it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.'"  *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984).

Preliminarily, insofar as Plaintiff is alleging the Government was negligent in selection of L&D as the Sprinkler Project's Contractor, the selection and supervision of contractors is a discretionary function for which the Government cannot be held liable. *See Varig Airlines*, 467 U.S. at 819-20 ("When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind").  *See also Farley v. United States*, 2014 WL 198331, at *5 (W.D.N.Y. Jan. 15, 2014) ("'the United States cannot be held liable for the selection and supervision of independent contractors, because the selection and supervision of contractors is a discretionary function.'" (quoting *Cerrone*, 2006 WL 2795614, at * 3)).  Accordingly, the court considers whether the DFE exempts the Government from liability under the FTCA for negligent design and failure to warn.

The court construes Plaintiff's negligent design theory of liability as referring to the Government's failure to alter either the design of the subject tank either by adding another access point that was not directly under the ductwork, or relocating the tank in such a manner that the manhole was not under the ductwork, or rerouting the ductwork that passed directly over the manhole, and the failure to warn theory as the Government's failure to warn of the danger posed to any worker who attempted to access the subject tank through the manhole.[13]  The evidence in the record, however establishes that the Government's exercise of its discretion not to re-design the subject tank or the location of the surrounding ductwork was grounded in economic policy

---

[13] Because the parties have not raised the issue, the undersigned does not address whether Plaintiff's claims alleging design defect and failure to warn under New York landlord liability law state claims for relief inasmuch as the FTCA does not waive sovereign immunity for claims sounding in strict liability. *Roditis*, 122 F.3d at 108 ("The FTCA, however, precludes government liability absent a negligent act, and, thus, 'does not extend to liability without fault.'" (quoting *Dalehite v. United States*, 346 U.S. 15, 44 (1953))).

considerations given the excessive cost of such alteration, any alteration was impractical because space considerations would not permit relocating the tank or rerouting the ductwork in a manner as to provide easier access, and the selection of a smaller-statured employee to perform the work on the subject tank would have avoided the injuries to Plaintiff.

Specifically, Reiter explained that alteration was not a practical consideration as space considerations on the 14th floor did not permit either relocating the subject tank or rerouting the ductwork.  Reiter Dep. Tr. at 20-26.  That adding another access point to the subject tank would be costly was confirmed by L&D, Johnson Declaration ¶ 8 (describing as "enormous [the] cost of putting in a second manhole, in a location with better access"), and was deemed unwarranted given that the subject tank was relined without incident in the earlier relining project.  Rizzo Dep. Tr. at 52; Johnson Declaration ¶ 13.  According to Reisman, tank workers were used to "confined spaces," and the location of the ductwork to the subject tank's manhole would present a hazard to anyone attempting to enter or access the subject tank.  Reisman Dep. Tr. at 47-50.  As such, it was the Contractor's responsibility "to identify how their worker can safely enter and exit that tank."  *Id.* at 50.

Significantly, Johnson of L&D concurs that "L&D had no reason to include the cost of moving the manhole in its bid, because it had no reason to regard the manhole's location as unsafe, nor to anticipate that a company engaged in the business of relining water storage tanks, such as the plaintiff's employer Eastern Tank Services, would assign the task to a large, tall person, such as the plaintiff."  Johnson Declaration ¶ 10. Johnson continues that "if the plaintiff indeed had difficulty entering or exiting the tank,

and injured himself in the process, it was not because of the manhole's location but because [Plaintiff] was not fit for this particular job." *Id.*  Johnson further explained that "[s]torage tanks are often located in situations where a small-sized worker is required in order to enter and exit without difficulty.  A smaller-statured worker is often required also to work inside the sometimes tight confines of a tank." *Id.* ¶ 11.  Johnson describes Plaintiff as "a large man, approximately six feet tall, and corpulent, weighing . . . at last [*sic*] 210 lbs." *Id.* ¶ 5.

The evidence in the record thus establishes that the DFE precludes the Government's liability for design defect or failure to warn because the Government's decision not to alter the tank or its location or the location of the ductwork was grounded in economic policy given the cost of any such alteration and the Government's perception, supported by L&D, that no alteration was necessary provided the worker chosen to work inside the subject tank was of a physical size that permitted the employee to access the tank without incident, a fact that was evident by the completion of the earlier relining project without incident.  Accordingly, the Government's Motion should be GRANTED with regard to the DFE.

## CONCLUSION

Based on the foregoing, the Government's Motion (Doc. No. 37), should be

GRANTED; the action should be DISMISSED as to the Government, including Plaintiff's

claims against the Government, L&D's cross-claim against the Government, and the

Government's cross-claim against L&D.

                                  Respectfully submitted,


                                  /s/ *Leslie G. Foschio*
                                  _____
                                          LESLIE G. FOSCHIO
                                  UNITED STATES MAGISTRATE JUDGE


DATED:        September 2, 2014
              Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      September 2, 2014
            Buffalo, New York